**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE**

| | | |
|---|---|---|
| PROSPECT CAPITAL MANAGEMENT L.P., | ) ) ) | |
| Petitioner, | ) ) | |
| v. | ) ) | Civil Action No. 22-mc-89-MN-CJB |
| STRATERA HOLDINGS, LLC and DESTRA CAPITAL MANAGERS LLC, | ) ) ) | |
| Respondents. | ) ) | |

## <u>REPORT AND RECOMMENDATION</u>

Presently pending before the Court in this miscellaneous action are cross-motions seeking relief pursuant to the Federal Arbitration Act ("FAA"), 9 U.S.C. §§ 9 and 10, as follows:  (1) Prospect Capital Management L.P.'s ("Prospect" or "Petitioner") Petition and Motion to Confirm Arbitration Award and Vacate Unauthorized Modifications ("Motion to Vacate"), (D.I. 1); (2) Prospect's Supplemental Petition and Motion to Confirm Arbitration Award and Vacate Unauthorized Modifications ("Supplemental Motion"), (D.I. 14); and (3) Stratera Holdings, LLC's ("Stratera") and Destra Capital Managers LLC's ("Destra") (collectively, "Respondents") Counter-Petition and Motion to Enforce Arbitration Award ("Motion to Enforce," and collectively with the Motion to Vacate and Supplemental Motion, the "motions"), (D.I. 31).  For the following reasons, the Court recommends that Prospect's Motion to Vacate and Supplemental Motion be DENIED, and Respondents' Motion to Enforce be GRANTED.

## I.    BACKGROUND

### A.    The Underlying Dispute

The dispute that gave rise to the present motions centers on the distribution of fees owed from the management of an income fund.  In 2012, Prospect and Stratera launched the Priority

Income Fund ("Fund").  (D.I. 1 at ¶ 1)  Prospect and Stratera were the two original members of Priority Senior Secured Income Management, LLC ("LLC"), the entity that managed the Fund's investments and that received management and incentive fees ("Fees") from the Fund.  (*Id*. at ¶¶ 1-2, 24; D.I. 31 at ¶¶ 8-9, 11)  When the Fund launched, Prospect provided all advisory and administrative services to the Fund, while Provasi Capital Partners LP ("Provasi"), a Stratera subsidiary, acted as the "Dealer Manager" or "wholesaler."  (D.I. 1 at ¶¶ 1, 24; D.I. 31 at ¶¶ 14-15)  As Dealer Manager/wholesaler, Provasi marketed and distributed the Fund's shares; it did so pursuant to a separate agreement between the Fund and Provasi known as the "Dealer Manager Agreement."  (D.I. 1 at ¶¶ 1, 24; D.I. 31 at ¶¶ 14-15)

The division of Fees between Prospect and Stratera was administered by a contract that governed the relationship between the two entities:  the "Second Amended and Restated Limited Liability Company Agreement" (the "Second Agreement").  (D.I. 31 at ¶¶ 11-13; D.I. 4, ex. 3 at 3)  Pursuant to the Second Agreement, Prospect and Stratera originally split the Fees 50/50; this 50/50 revenue split was not contingent on any further action by Stratera or distribution by Provasi.  (D.I. 31 at ¶ 16; *see also* D.I. 3 at 3; D.I. 4, ex. 3 at 6)  In other words, Prospect and Stratera were to split the revenue 50/50 regardless of, *inter alia*, whether purchased shares were distributed in an initial offering, or whether those shares were distributed through the Fund's dividend reinvestment program ("DRIP").  (D.I. 4, ex. 3 at 6)

DRIP programs are particularly relevant to this dispute.  When investors purchase shares through broker-dealers, they have the option to either:  (1) receive their periodic distributions in the fund in the form of cash, or (2) use the distribution money to instead purchase additional shares of the fund through the fund's DRIP program.  (D.I. 31 at ¶ 27)  Herein, references to the purchase of "DRIP shares" relates to the second option.

2

In March 2018, Provasi provided the Fund with notice that it was terminating the Dealer Manager Agreement.  (D.I. 1 at ¶ 25; D.I. 31 at ¶ 17)  Prospect approached Provasi and asked Provasi if it would continue on as Dealer Manager; Provasi, in turn, approached Destra about the possibility of Destra's subsidiary, Destra Capital Investments, LLC ("DCI"), acting as a sub-wholesaler under Provasi.  (D.I. 1 at ¶ 26; D.I. 31 at ¶¶ 18-19)  This relationship was memorialized in May 2018, when Prospect, Stratera and Destra entered into a new agreement concerning the division of Fees:  the "Third Amended and Restated Limited Liability Company Agreement" (the "Third Agreement").  (D.I. 1 at ¶ 26; D.I. 4, ex. 3 at 2)

As part of the negotiations leading up to the Third Agreement, the parties discussed Destra's involvement, including how to structure Destra's compensation.  To that end, Stratera and Destra told Prospect that they wanted Destra to receive a portion of the Fees paid to Stratera under the Second Agreement, with the overall Fee split between Prospect and Stratera/Destra to remain the same as it was under the Second Agreement (i.e., 50/50).  (D.I. 31 at ¶ 21 (citing D.I. 4, ex. 4 at 7-8))  The parties agreed to this arrangement via the execution of term sheets.  (*Id.*; *see also* D.I. 4, ex. 3 at 7)  The term sheets indicated that Destra was to receive 75% of the Fees that Stratera would have received had the Second Agreement continued (i.e., 37.5% of Stratera's 50% under the terms of the Second Agreement).  (D.I. 4, ex. 3 at 7)

Although the parties agreed that the fee split between Prospect and Stratera/Destra would remain the same, Prospect proposed various changes to the contractual language concerning the calculation of the parties' fee percentages.  For example, Prospect now inserted into the draft Third Agreement a provision that tied Destra's and Stratera's share of Fees to the number of Fund shares their respective affiliates actually sold *in an offering*.  (D.I. 1 at ¶ 27; D.I. 31 at ¶¶ 22-23)  This was memorialized at various points in the Third Agreement.  For example, Section

3

4.01(a)(2) of the Third Agreement required, among other things, distribution of Net Distributable Cash to each Member based on:  (1) the amount of cash received by the LLC from the Fund as payment of the Base Management Fee or the Incentive Fee, multiplied by (2) the "Applicable Fee Party Percentage."  (D.I. 4, ex. 1 at § 4.01(a)(2))  The Applicable Fee Party Percentage was, in turn, defined in Section 10.01 as the "Stratera Fee Party Percentage, the Destra Fee Party Percentage or the P[rospect] Fee Party Percentage, as applicable[.]"  (*Id.* at § 10.01)  The Destra Fee Party Percentage was determined by taking into account certain "Destra Fee Party Shares[.]" (*Id.*)  And the definition of "Destra Fee Party Shares" now provided that Destra was to receive compensation based on the percentage of Fund shares "*issued in an Offering* for which Destra Capital Investments LLC acts as the dealer-manager, sub-dealer-manager, sub-wholesaler, underwriter, or any similar role," with Destra receiving Fees as to 37.5% of such Fund shares. (*Id.* (emphasis added))  The Stratera Fee Party Percentage was similarly defined in terms of "Stratera Fee Party Shares[,]" such that Stratera's portion of Fees was based on 50% of the Fund shares "issued in the Offering" prior to the date of the Third Agreement, plus 12.5% of the Fund shares "issued in an Offering" for which DCI acted as sub-wholesaler.  (*Id.*)  For our purposes here, it is undisputed that DRIP shares are not Fund shares that are "issued in an Offering."

Respondents did not reject this new "issued in [an] Offering" language that Prospect had inserted into the draft of the Third Agreement.  (D.I. 4, ex. 3 at 8)  However, Respondents did attempt to confirm that the basis for the distribution of Fees would remain unchanged from the approach taken in the Second Agreement.  (*Id.*; D.I. 31 at ¶ 24)  To do so, Destra insisted that Prospect provide a schedule showing the planned methodology for dividing Fees—a document that was ultimately incorporated into the Third Agreement as Schedule 11.18.  (D.I. 31 at ¶¶ 24-25)  Additionally, the parties included language in Section 11.18 of the Third Agreement

directing that fee percentages should be calculated in accordance with this schedule.  (*Id.* at ¶ 26; *see also* D.I. 4, ex. 1 at § 11.18 ("In determining the amounts of all such allocations and distributions of Net Distributable Cash, the Operating Member shall calculate the Destra Fee Party Percentage, Stratera Fee Party percentage, and P[rospect] Fee Party percentage in accordance with Schedule 11.18[.]"))

When DCI became the sub-wholesaler to Provasi, it took on the same role of interacting with dealers that Provasi had performed in the past.  (D.I. 31 at ¶ 28)  Among other things, DCI assisted investors regarding their decision as to whether to choose DRIP shares instead of taking a cash dividend.  (*Id.*)

After execution of the Third Agreement, in connection with the first Quarterly Certification of Fee Party Shares, Prospect took the position that, *inter alia*, it did not consider DRIP shares to be Fund Shares that were "issued in an Offering."  (D.I. 1 at ¶ 4; D.I. 31 at ¶ 30) Therefore, in calculating the Fees owed, Prospect excluded Provasi-sold DRIP shares and DCI-sold DRIP shares[1] from the shares credited to Stratera and Destra.  (D.I. 31 at ¶ 30)  Respondents disputed this interpretation of the Third Agreement, arguing that Schedule 11.18 provided for a 50/50 split of all Fees, regardless of whether those Fees were "issued in an Offering."  (D.I. 1 at ¶ 30)

B.    **The Arbitration**

Stratera initiated the arbitration against Prospect in June 2019; in August 2020, Destra joined as a co-claimant.  (D.I. 1 at ¶¶ 31-32; D.I. 31 at ¶¶ 34-35)  In the arbitration, Respondents

---

[1]     For efficiency's sake, herein the Court will refer to DRIP shares issued in place of cash dividends on shares sold by Provasi, prior to the Third Agreement, as "Provasi-sold DRIP shares" and it will refer to DRIP shares issued in place of cash dividends on shares sold by DCI as "DCI-sold DRIP shares."

made a number of legal claims, and two such claims were that they should have received Fees on: (1) DCI-sold DRIP shares and (2) Provasi-sold DRIP shares.  (D.I. 1 at ¶¶ 3, 33, 40; D.I. 4, ex. 3 at 3-5; D.I. 31 at ¶¶ 28-29, 36, 38)  After an eight-day evidentiary hearing conducted from July 19, 2021 through July 28, 2021, the three-arbitrator panel ("the Panel") issued an order establishing which issues were now being submitted to the Panel and which were bifurcated.  (D.I. 31 at ¶¶ 39-40)  That order stated that "[p]roceedings with respect to attorneys' fees will be conducted after the Panel issues an Order on liability and damages, if any."  (*Id.* at ¶ 41)

### 1.    The Interim Award

On October 8, 2021, the Panel issued an 18-page award, entitled "Interim Award of Arbitrators" (the "Interim Award").  (D.I. 4, ex. 3 at 2)[2]  The Interim Award included:  (1) a two-page "Introduction" section, (*id*. at 1-2); (2) a two-page "The Claims and Relief Sought" section, (*id*. at 3-4); (3) a one-page "Holding" section, (*id*. at 4-5); (4) a four-page "Findings of Fact" section, (*id*. at 5-9); (5) an eight-page "Conclusions of Law" section, (*id*. at 9-17); and (6) a one-page "Interim Award" section, (*id*. at 17-18).

In the Interim Award, the Panel began the Introduction section by stating that the parties had "not requested a reasoned award" and explaining that, as a result, the nature of the analysis in the Interim Award could be limited at times.  (*Id*. at 2 ("Accordingly, the analysis that follows will not cite extensively to transcript testimony, hearing exhibits or case law unless the Panel

---

[2]    As will be discussed further below, the parties spar over whether this document should be properly referred to as the "Interim Award" or the "Award."  (*See, e.g.*, D.I. 31 at ¶ 53; D.I. 35 at 1)  The Court will refer to it herein as the "Interim Award" simply because those are literally the first two words of the title ("Interim Award of Arbitrators") that the Panel used for the document.  (D.I. 4, ex. 3 at 1)  The Court will further discuss the legal relevance of the Panel's use of that title in Section III of this Report and Recommendation.

deems it necessary for clarification or emphasis.")) Nevertheless, the Panel stated that it had

considered all arguments and was resolving all claims:

> The Panel has fully considered all arguments raised. In view of the
> direction in the arbitration provision of the Third Agreement
> concerning the nature of the award, quoted *supra*, we do not
> address each such argument. The fact that we do not address some
> arguments in the ensuing discussion does not mean that such
> arguments were not fully considered by the Panel.

(*Id.*)

The Panel then summarized the Interim Award's legal holdings in the Holding section.

Therein, the Panel concluded that Prospect had breached the Third Agreement "by not

calculating the [F]ees such that the Stratera Fee Party Shares and Destra Fee Party Shares

included DRIP shares in lieu of cash dividends that would have otherwise been due *on the shares*

*for which Destra Capital Investments, LLC ("DCI") served as sub-wholesaler*[.]" (*Id.* at 4-5

(emphasis added)) Accordingly, the Panel ordered Prospect to pay Respondents their "respective

share[s] of all Management and Incentive Fees that were collected and improperly retained by

Prospect and not distributed to Claimants to date on the *above-described* DRIP [s]hares" and

other forms of monetary relief related to such shares. (*Id.* (emphasis added)) It ended the

section by noting that "[a]ll other claims and relief sought are dismissed." (*Id*. at 5)

In the Conclusions of Law section, the Panel set out the key reasoning that supported its

legal conclusions.[3] The Panel explained that it believed there to be an ambiguity in the Third

Agreement with respect to the treatment of Fees related to DRIP shares. Specifically, while

Sections 4.01(a)(2) and 10.01 seemed to confine Respondents to capturing Fees regarding only

those shares "issued in an Offering[,]" the Panel concluded that Section 11.18 and Schedule

---

[3]      The Court will discuss this reasoning in further detail in Section III below.

11.18 demonstrated that DRIP shares should in fact be included in the relevant Fee calculations.

(*Id.* at 9-13)  Because this ambiguity existed, the Panel considered parol evidence in order to

determine the expectations that formed the basis of the contractual relationship.  (*Id*. at 13)  In

doing so, the Panel concluded that the "parties' negotiations demonstrate[d] that [Respondents]

expected to be paid on DRIP shares and that Prospect knew of their expectation." (*Id.*)  Since

Prospect had drafted Schedule 11.18 in a manner that confirmed Respondents' expectation

concerning the allocation of Fees, the Panel deemed Prospect to have "accepted the inclusion of

DRIP shares notwithstanding the provisions in the Third Agreement [i.e., those in Sections

4.01(a)(2) and 10.01] that might otherwise be interpreted to exclude DRIP shares because they

were not 'issued in the Offering[.]'"  (*Id*.)  Thus, the Panel concluded that "parol evidence

supports [Respondents'] position that the calculation of the Applicable Fee Party Percentages

must include [F]ees on DRIP shares."  (*Id.*)[4]

     Lastly, in the final Interim Award section, the Panel ordered the parties to exchange

certain information so that the parties could calculate Respondents' "share of all Management

and Incentive Fees that were collected and improperly retained by Prospect and not distributed to

[Respondents] to date on the above-described DRIP shares[.]"  (*Id.* at 17)  Within one week from

---

[4]     In the Conclusions of Law section, the Panel went on to address a few other legal issues that had been presented by the parties.  These included:  (1) Respondents' assertion that Prospect was liable for Fees on certain additional shares known as "Stira Shares" (the Panel found that Prospect was not liable as to those shares); (2) Respondents' claim for unilateral mistake (the Panel did not reach this issue, in light of its conclusion that Prospect had breached the relevant contract); and (3) Respondents' claim of fraudulent inducement (the Panel found that Respondents had not established, by clear and convincing evidence, that Prospect had committed fraudulent inducement).  (D.I. 4, ex. 3 at 14-17)  Because these issues do not significantly impact the Court's decision herein, the Court will not mention them further in this Report and Recommendation.

receiving this information, the parties were to make a joint submission to the Panel on their concurrence or objections to the information provided.  (*Id.* at 18)  The Panel also again stated that "[a]ll claims not addressed herein are denied."  (*Id.*)  And it concluded by noting that the "Interim Award [was to] remain in full force and effect until such time as a final Award is rendered."  (*Id.*)

### 2. Dispute Over the Panel's Decision

As the parties began to exchange the information necessary to calculate the Fees owed to Respondents, it soon became clear that they disagreed on the scope of the Panel's Interim Award.  (D.I. 1 at ¶¶ 48-49; D.I. 31 at ¶¶ 58-59)  Prospect interpreted the award to mean that the Panel had only ruled in Respondents' favor as to DCI-sold DRIP shares, (D.I. 1 at ¶ 48), while Respondents believed that the Panel had found in their favor on both DCI-sold and Provasi-sold DRIP shares, (D.I. 31 at ¶ 59).

Given this disagreement, Respondents wrote to the Panel on October 27, 2021, asking that the Panel clarify its intent to the parties, particularly as to whether its decision regarding DCI-sold DRIP shares also applied to shares for which Provasi had served as a Dealer Manager. (D.I. 1 at ¶ 49; D.I. 31 at ¶ 60; D.I. 36, ex. 1-G)  On the same day, Respondents also filed a "request for clarification, or, in the alternative, modification of interim award," in which they contended that there was no basis for the Panel to make any distinction between DCI-sold DRIP shares and Provasi-sold DRIP shares.  (D.I. 31 at ¶ 62; D.I. 36, ex. 1-I)  Prospect filed a letter with the Panel in response on October 28, 2021, in which it disagreed with Respondents' arguments.  (D.I. 1 at ¶¶ 51-52; D.I. 36, ex. 1-H)  The parties thereafter made a number of additional submissions to the Panel regarding this issue and others.  (*See, e.g.*, D.I. 36, ex. 1-K at 1 & n.1)

9

### 3.      Order #22 and the Revised Interim Award

On December 15, 2021, the Panel issued Order #22 (the "Order" or the "Supplemental Order") in response to Respondents' request for clarification.  (D.I. 4, ex. 5)  In the Order, the Panel clarified that its intent in issuing the Interim Award was to award Fees to Respondents for both DCI-sold *and* Provasi-sold DRIP shares, a conclusion that the Panel felt implicitly (and, indeed, necessarily) flowed from the language in the Interim Award.  (*Id*.)  Specifically, the Panel stated that:

> The essence of the Panel's conclusion was that [F]ees on DRIP shares should be included in the [A]pplicable Fee Party Percentage, a conclusion that necessarily applies to DRIP shares flowing from shares issued by Provasi.  The Panel's holding did not make this latter point clear, but rather referred specifically only to [F]ees on DRIP shares flowing from shares issued through DCI as sub-wholesaler.

(*Id.* at 1-2)  The Panel then explained the basis for its conclusion that Stratera and Provasi were entitled to be paid on all DRIP shares:

> In its Interim Award, the Panel reached its conclusion based upon the ambiguity created by the inconsistency between the text of the parties' Third Agreement and Schedule 11.18 to that Agreement. Because the last sentence of Section 11.18 stated that calculation of the Fee Party Percentages *must* be performed on the basis of Schedule 11.18, and [Prospect] prepared Schedule 11.18, we concluded that [Prospect] is deemed to have accepted the inclusion of DRIP shares in the calculation of the Applicable Fee Party Percentages, notwithstanding provisions in the Third Agreement that might otherwise be interpreted to exclude DRIP shares.

(*Id.* at 2 (emphasis in original))  Thus, the Panel explained that "[t]he essence of the Panel's ruling on the merits is that Schedule 11.18 requires the inclusion of *all* DRIP shares, and not just those issued on shares issued through DCI acting as sub-wholesaler, in the calculation of Destra and Stratera Fee Party Percentages."  (*Id.* (emphasis in original))

10

In taking this step, the Panel also addressed Rule 50 ("Rule 50") of the Commercial Arbitration Rules (the "Rules") of the American Arbitration Association (or "AAA"), since the AAA's Rules applied to the arbitration.  (*Id*. at 1; *see also id*., ex. 1 at § 11.15(b)(B); D.I. 31 at ¶ 32)  The Panel noted that Rule 50 allows an arbitrator, at the request of the parties, to correct any clerical, typographical, or computational errors in the award, but does not permit the arbitrator to redetermine the merits of any claim already decided.  (D.I. 4, ex. 5 at 1)  The Panel stated that the "mistake" in the Interim Award that it now sought to correct did not amount to correction of a clerical, typographical or computational error.  (*Id*.)  But the Panel concluded that Rule 50 did not "prohibit a party from requesting that an arbitrator clarify or modify an award" nor did it prohibit the Panel from taking the steps set out in the Order, which amounted to "clarifying the effect or consequence of a claim already decided[.]"  (*Id*. at 1; *see also id.* at 2-3 ("[T]he Panel is simply clarifying the effect—at most, correcting its earlier characterization of the effect—of its determination of [Respondents'] claim for inclusion of DRIP shares in the calculation of their [F]ees."))  The Panel further explained that it had simply poorly described its intent in the Interim Award by "fail[ing] to make clear that full effectuation of its intent required a clear statement to the effect that the calculation must be based not only on DRIP on shares issued through DCI, but also DRIP on shares issued through Stratera's subsidiary, Provasi."  (*Id*. at 2)  In stating that it was now "correcting that oversight[,]" the Panel concluded that "[d]oing so does not, however, require re-visiting the Panel's conclusion on the merits."  (*Id*.)

The Panel also addressed the applicability of the *functus officio* doctrine (which will be further discussed below in great detail)—a doctrine providing that an arbitrator's authority to consider an issue is stripped once the arbitrator finally decides that issue.  After suggesting that it was possible that the doctrine did not apply at all to the situation here, the Panel nevertheless

concluded that even if it did, then two judicially-recognized exceptions to the doctrine were applicable. (*Id*. at 2-4)  This was because "the logical – indeed inevitable – conclusion of [the Panel's] analysis with respect to [Respondents'] entitlement to inclusion of DRIP shares in the calculation of their [F]ees is that Section 11.18 *requires* that DRIP shares issued and outstanding on the shares issued through DCI and Provasi be included in the calculation of [Respondents'] [F]ees[,]" and that "[t]his was the core of the Panel's conclusion, and that conclusion has not been re-visited or changed." (*Id*. at 3 (emphasis in original))

In light of this, the Panel found that the second exception to the *functio officio* doctrine —where the award "'does not adjudicate an issue which has been submitted'"—was purportedly applicable because it "presumably includes cases in which the award does not *completely* adjudicate an issue that has been submitted" and because here, "by failing to address adequately in the Panel's holding the effect of its determination of the issue of entitlement to inclusion of the DRIP shares in the calculation of [Respondents'] fees, the Panel failed to adjudicate the issue completely." (*Id*. at 4 (emphasis in original))  The Panel also concluded that the third exception to the *functio officio* doctrine—involving circumstances where "'the award, although seemingly complete, leaves doubt whether the submission has been fully executed, [such that] an ambiguity arises which the arbitrator is entitled to clarify'"—also applied here. (*Id*.)  The Panel found that this exception was implicated in that it "appears to apply to circumstances in which a mistake is not apparent on the face of the award, but the award leaves doubt as to whether it is complete, and requires clarification" and because "[f]or the reasons discussed above, the Interim Award requires clarification." (*Id*.)

In conjunction with the Order, the Panel also issued a Revised Interim Award, which in various ways clarified that DRIP shares flowing from both DCI-sold shares *and* Provasi-sold

shares would be included in the calculation of Fees owed to Stratera and Destra.  (D.I. 4, ex. 4 at 5)

### 4.    The Final Award

After receiving information from the parties regarding the calculation of Fees, the Panel issued its Final Award (the "Final Award") on March 11, 2022; therein it awarded Respondents the following:

> A.    $6,103,866.00 for unpaid distributions through September 30, 2021. . . .
> B.    $643,314.00 in pre-award interest, which represents interest on $6,103,866.00 through March 11, 2022.
> C.    $3,492,790.66 in attorneys' fees, costs and expenses. . . . [and]
> D.    Post-award interest at the rate of 5.25% on $9,596,656.66, which is the sum of $6,103,866.00 . . . and $3,492,790.66 in attorneys' fees, costs and expenses. . . .

(D.I. 15, ex. 6 at 2, 4)[5]  The Final Award also included instructions on how Prospect should pay Respondents any owed Fees (and related interest) going forward.  (*Id*. at 5)

### C.    Procedural Background

Prospect filed its Motion to Vacate on February 15, 2022, (D.I. 1), and its Supplemental Motion on March 11, 2022, (D.I. 14).  Respondents filed their Motion to Enforce on April 19, 2022.  (D.I. 31)  Briefing was completed on June 17, 2022.  (D.I. 39; D.I. 41)

United States District Judge Maryellen Noreika referred the case to the Court on February 28, 2022.  (D.I. 11)

---

[5]    Prospect asserts that the impact of the Panel's actions flowing from the Order and the Revised Interim Award was to expand Prospect's liability "more than twenty-fold, from under $300,000 to nearly $7 million."  (D.I. 1 at ¶ 54; *see also* D.I. 14 at ¶ 4)

## II.     STANDARD OF REVIEW

The FAA permits a federal district court to confirm an arbitration award and enter a

judgment in certain circumstances, so long as the parties have agreed that such a judgment may

be entered upon the arbitrator's award and have specified the court that should do so.  9 U.S.C. §

9 ("Section 9").  The district court must grant such a requested order, unless the arbitrator's

award is vacated, modified or corrected as prescribed in Sections 10-11 of the FAA.  *Id*.

Relatedly, the FAA also governs a federal court's review of an arbitrator's award.  *See* 9

U.S.C. § 10(a).  Section 10(a) of the FAA allows a federal court to vacate an arbitration award in

four narrow circumstances:

> (1) where the award was procured by corruption, fraud, or undue
>     means;
>
> (2) where there was evident partiality or corruption in the
>     arbitrators, or either of them;
>
> (3) where the arbitrators were guilty of misconduct in refusing to
>     postpone the hearing, upon sufficient cause shown, or in
>     refusing to hear evidence pertinent and material to the
>     controversy; or of any other misbehavior by which the rights of
>     any party have been prejudiced; or
>
> (4) where the arbitrators exceeded their powers, or so imperfectly
>     executed them that a mutual, final, and definite award upon the
>     subject matter submitted was not made.

*Id*.  The last of these circumstances, set out in Section 10(a)(4), is at issue here.

Federal policy favors arbitration, so courts start out with the presumption that an

arbitrator's award is enforceable.  *Caputo v. Wells Fargo Advisors, LLC*, No. 20-3059, 2022 WL

1449176, at *2 (3d Cir. May 9, 2022).  On review, "the court's function in confirming or

vacating a commercial arbitration award is severely limited[,]" and "[a]rbitration awards are set

aside only in very unusual circumstances[.]" *Provost v. Intrafusion Holding Corp.*, 926 F. Supp. 2d 532, 535 (D. Del. 2013) (internal quotation marks and citation omitted).

When it comes to an assertion that arbitrators exceeded their powers under Section 10(a)(4), a party seeking relief "bears a heavy burden." *Oxford Health Plans LLC v. Sutter*, 569 U.S. 564, 569 (2013). It is not enough to show that the arbitrators committed an error, or even a serious error; instead, because the parties bargained for the arbitrator's construction of their agreement, an "arbitral decision even arguably construing or applying the contract must stand, regardless of a court's view of its (de)merits." *Id*. (internal quotation marks and citation omitted). Only if the "arbitrator[s] act[] outside the scope of [their] contractually delegated authority [by] issuing an award that simply reflect[s] [their] own notions of [economic] justice rather than draw[ing] its essence from the contract[, ] may a court overturn [their] determination." *Id*. (internal quotation marks and citations omitted).

The United States Court of Appeals for the Third Circuit has also "assume[d] without deciding" that an arbitration award could be vacated on another ground not enumerated in Section 10(a): "manifest disregard of the law[.]" *Bayside Construction LLC v. Smith*, No. 21-2716, 2022 WL 2593303, at *2 n.6 (3d Cir. July 8, 2022); *see also Caputo*, 2022 WL 1449176, at *2 n.11. This "manifest disregard of the law" standard is an "extremely deferential" standard; it requires that a movant show that the arbitrator's decision "fl[ies] in the face of clearly established legal precedent[.]" *Caputo*, 2022 WL 1449176, at *4 (internal quotation marks and citations omitted). This ground too is at issue in this appeal.

## III.    DISCUSSION

Prospect claims that the Panel exceeded its powers under Section 10(a)(4) and manifestly disregarded the law when, via the issuance of the Revised Interim Award and Final Award, it

expanded Prospect's liability to include Provasi-sold DRIP shares in the calculation of Fees. Therefore, Prospect asks the Court to confirm the Interim Award and vacate the Revised Interim Award and the Final Award.  (D.I. 1 at 1 & ¶¶ 64-79; D.I. 14)  The crux of Prospect's argument is that the Interim Award constituted a final decision on the liability issues in the dispute.  By issuing the Revised Interim Award and Final Award, Prospect contends that the Panel violated: (1) the *functus officio* doctrine; and (2) AAA Rule 50.  (D.I. 1 at 1 & ¶¶ 72, 78; D.I. 14)  Upon the vacatur of the purportedly unauthorized modifications, Prospect seeks to have the Interim Award enforced as final pursuant to Section 9 of the FAA.

For their part, Respondents seek to enforce the Final Award in its entirety, pursuant to Section 9.  (D.I. 31 at ¶¶ 107-09, 114)  Respondents also seek an award of attorneys' fees, costs and expenses for the monies expended in enforcing the arbitral award.  (*Id.* at ¶¶ 110-13, 115)

The briefing on these issues was prodigious.  (D.I. 1; D.I. 3; D.I. 14; D.I. 31; D.I. 32; D.I. 35; D.I. 37; D.I. 38; D.I. 39; D.I. 41)  The legal issues involved were complicated and, as the Court will describe below, they were not easy ones to resolve.  The Court has, as a result, spent a significant amount of time and resources in an effort to understand the issues at play and to address those issues in a comprehensive manner herein.

Below, the Court will first address the question of whether the Interim Award was a final decision by the Panel—i.e., whether the *functus officio* doctrine could apply here.  In doing so, the Court will conclude that the Interim Award amounts to a final decision on all submitted liability issues, including the Provasi DRIP issue.  Then the Court will explain why the Panel's subsequent issuance of the Revised Interim Award and Final Award fell under an exception to the *functus officio* doctrine and did not violate Rule 50 (and thus, why the Panel acted properly

when it issued those awards).  Lastly, it will address Respondents' request for attorneys' fees, costs and expenses.

## A. *Functus Officio* Doctrine

The doctrine of *functus officio*, which is Latin for a "task performed," is a common law doctrine that prevents an arbitrator from in any way revising, reexamining, or supplementing the merits of his or her award once it has been issued.  *Office & Pro. Emps. Int'l Union, Local No. 471 v. Brownsville Gen. Hosp.*, 186 F.3d 326, 331 (3d Cir. 1999); *Teamsters Local 312 v. Matlack, Inc.*, 118 F.3d 985, 991 (3d Cir. 1997).  In other words, "once [an] arbitrator decides an issue, the *functus officio* doctrine prohibits him from revising that decision without the parties' consent."  *Verizon Penn. LLC v. Commc'ns Workers of Am.*, 13 F.4th 300, 303-04 (3d Cir. 2021).  "He can decide other issues submitted by the parties, correct clerical errors, and even clarify his initial decision—but nothing more."  *Id*.  "The doctrine is motivated by a perception that arbitrators, lacking the institutional protection of judges, may be more susceptible to outside influences pressuring for a different outcome and also by the practical concern that the *ad hoc* nature of arbitral tribunals makes them less amenable to re-convening than a court."  *Office & Prof'l Emps. Int'l Union*, 186 F.3d at 331.  The *functus officio* doctrine is "alive and well" in the Third Circuit, and it applies even more strictly to commercial arbitrations (as here) than it might otherwise in labor arbitrations.  *Verizon*, 13 F.4th at 307; *Office & Pro. Emps. Int'l*, 186 F.3d at 331.

The parties have a number of disagreements regarding whether the *functus officio* doctrine could apply to the circumstances of this case.  The Court will take those up in turn.

### 1. When is an Award "Final" for Purposes of *Functus Officio*?

There is no dispute between the parties that the *functus officio* doctrine only applies when an arbitrator has made a "final award." (D.I. 3 at 10; D.I. 35 at 13); *see also La Vale Plaza, Inc. v. R.S. Noonan, Inc.*, 378 F.2d 569, 572 (3d Cir. 1967) ("It is an equally fundamental common law principle that once an arbitrator has made and published a final award his [or her] authority is exhausted and he [or she] is functus officio and can do nothing more in regard to the subject matter of the arbitration."). The parties' initial dispute, however, is over the circumstances under which an award can be deemed a "final" award, such that the *functus officio* doctrine could take effect.

Prospect points to a recently-issued Third Circuit opinion, *Verizon Penn. LLC v. Commc'ns Workers of Am.*, 13 F.4th 300 (3d Cir. 2021), and argues that *Verizon* sets forth the standard for when an award is final for purposes of *functus officio*. (D.I. 3 at 10) According to Prospect, *functus officio* "'applies to partial decisions that finally resolve some, but not all, of the submitted issues[.]'" (D.I. 3 at 10 (quoting *Verizon*, 13 F.4th at 308)) Thus, Prospect contends that despite the Interim Award's title, and despite the fact that that award did not address certain issues presented to the Panel by the parties (such as a calculation of damages or an award of attorneys' fees, expenses and costs), the Interim Award was in fact a "final award" for purposes of the *functus officio* doctrine because it finally resolved all *issues of liability*. (*Id.*)

The Court agrees with Prospect. To explain why, it makes sense to start with *Verizon*.

The dispute in *Verizon* arose between Communications Workers of America Local 13000 ("Local 13000") and Verizon Pennsylvania LLC ("Verizon"); that dispute related to how Verizon customers received and installed set-top boxes for their Verizon FiOS service. *Verizon*, 13 F.4th at 304. Originally, customers had the option to either: (1) pick up a set-top box from a Verizon store and install it themselves or (2) have a Union Service Technician deliver the box to

18

the customer's home and install it for the customer.  *Id*.  Then, in 2007, Verizon added a third

and a fourth option:  Verizon could mail the box to its customers at its own expense using a

common carrier, and then the customer could either:  (3) install the box himself or herself, or (4)

have a Union Service Technician come out to install it for a fee.  *Id.*  Local 13000 filed a

grievance in arbitration, arguing that Verizon violated the terms of the parties' Collective

Bargaining Agreement ("CBA") by contracting out union work to common carriers through the

two common carrier/mail options.  *Id.*

 An arbitration panel issued a July 2016 decision (the "Merits Award"); in that Merits

Award, the panel framed the issue submitted as whether Verizon violated the CBA "'by

implementing a process to *deliver* set[-]top boxes to *existing* customers by common carrier for

customer self-installation.'"  *Id.* at 304-05 (emphasis added) (citation omitted).  The panel

ultimately agreed with Local 13000 that these mail options violated the CBA by allowing

common carriers to benefit from work that was originally assigned to service technicians.  *Id.*

The panel concluded that the service technicians "'who have been denied the opportunity to

perform the delivery work in question are entitled to compensation'" and ordered Verizon "'to

cease and desist from delivery of set top boxes by anyone other than'" union employees (i.e., the

Union Service Technicians).  *Id.* at 305 (citation omitted).  However, because there was no

record evidence before the arbitrators that would allow them to assess how often Verizon mailed

set-top boxes to existing customers via common carriers, the arbitrators "'referred [the issue of

money damages] back to the parties for resolution'" and retained jurisdiction in case the parties

could not agree on a monetary remedy.  *Id.* (alteration in original) (citation omitted).

 When the parties failed to reach an agreement as to a monetary remedy, the arbitrators

issued a "Remedy Award" on January 10, 2018.  *Id.*  As part of the Remedy Award, the

arbitrators agreed with Local 13000 that in the Merits Award, the arbitrators had ruled that both the delivery and *self-installation* aspects of the mail options violated the CBA.  *Id*. at 304-05. Additionally, the arbitrators concluded in the Remedy Award that their earlier ruling applied not only to existing customers, but to *new* customers as well.  *Id.*

Verizon then filed suit, arguing that the Remedy Award improperly expanded the scope of the arbitrator's Merits Award in violation of the *functus officio* doctrine by including:  (1) deliveries *and* self-installations, rather than just deliveries, and (2) deliveries to new customers, rather than just existing customers.  *Id.* at 306-07.  The United States District Court for the Eastern District of Pennsylvania agreed with Verizon and granted summary judgment in part to Verizon on these grounds.  *Id.* at 306.  Local 13000 appealed.  On appeal, the Third Circuit upheld the district court's decision, agreeing that the Remedy Award improperly expanded the scope of the earlier Merits Award.  *Id.* at 308.

In explaining the basis for its decision, the *Verizon* Court began by considering whether the Merits Award had actually addressed and finally decided the issue of whether self-installation violated the CBA.  *Id*.  The Court ultimately concluded that the Merits Award had done so—and that therein, the arbitrators had ruled that self-installation did *not* violate the CBA. In support of this conclusion, the Third Circuit noted that, in the Remedy Award, the arbitrators had acknowledged that they "had already decided the scope of the work assignment, *including the self-installation issue*, 'in [their] initial decision on the merits of the dispute.'"  *Id.* (emphasis added) (citation omitted).  And the *Verizon* Court explained that certain language in the opinion accompanying the Merits Award (the "Merits Opinion")—to the effect that the arbitrators were addressing not only "'the delivery of the equipment'" but also the "'*installation or maintenance work*'" associated therewith—also counseled in favor of this conclusion.  *Id.* (emphasis in

original) (citation omitted).  Indeed, the Court noted that had the self-installation issue not been within the scope of the parties' initial submission to the arbitrators, then the arbitrators would have "exceeded the scope of [their] authority by deciding that issue in the Remedy Award."  *Id*.  Therefore, because the arbitrators had in fact issued a final decision as to the self-installation issue in the Merits Award, the Third Circuit concluded that the arbitrators were *functus officio* with respect to that issue; they could not revise that decision in a later award.  *Id.* at 312.  And so when the arbitrators concluded in their Remedy Award that pay *was* due for the self-installation of set-top boxes, they had impermissibly violated the *functus officio* doctrine.  *Id*.

In arguing that the arbitrators could "revisit the scope of the work assignment in the remedy proceedings[,]" Local 13000 asserted that because the arbitrators "reserved the remedy issue" they could therefore "*redecide* the issues addressed in the Merits Award, including the scope of the work assignment" since the "Merits Award was not a 'final award' and the *functus officio* doctrine did not apply to it[.]"  *Id.* at 308 (emphasis in original).  The Third Circuit rejected this argument.  In doing so, the *Verizon* Court explained that "allowing arbitrators to revisit issues that they have already decided merely because they retained jurisdiction on ancillary issues—here, the monetary remedy—creates several potential problems."  *Id*.  Among those were that:  (1) "[p]artial awards are just as susceptible as 'final' awards to the types of *post hoc* influences and *ex parte* communications that the doctrine is meant to protect against"; and (2) were the law to be otherwise, an arbitrator "could issue a partial award as a placeholder to apply settlement pressure, rather than just adjudicating the dispute as the parties agreed that she would."  *Id.* at 309.  Thus, the Third Circuit reasoned that the *functus officio* doctrine applies "to

partial decisions *that finally resolve some, but not all, of the submitted issues*."  *Id.* at 308 (emphasis added).[6]

Verizon, then, seems to clearly support Prospect's view that the *functus officio* doctrine applies to the Panel's decisions on liability issues in the Interim Award.  After all, in *Verizon*, the Merits Award did not address an outstanding issue regarding a monetary remedy, but the Third Circuit nevertheless held that the *functus officio* doctrine was applicable to the issues that were actually resolved in that award—including liability issues.  In light of *Verizon*, it would seem difficult to argue here that because the Interim Award did not address issues regarding the appropriate calculation of damages, then that means that *functus officio* does not apply to the liability issues resolved in the Interim Award.

But Respondents *are* making just this type of argument.  They press this contention via two primary pathways, though neither are availing.

First, Respondents argue that the standard for evaluating whether an arbitral award is "final" for purposes of the *functus officio* doctrine is the same as the standard for determining whether such an award is sufficiently "final" so as to be ripe for judicial review.  (D.I. 35 at 13-14)  The doctrine regarding the latter type of arbitration-related "finality" is sometimes referred to as the "complete arbitration rule," which is a prudential rule of judicial administration (as opposed to a limitation on a district court's jurisdiction).  *Union Switch & Signal Div. Am.*

---

[6]       The *Verizon* Court also ruled—as to the dispute over the Remedy Award's alleged expansion of the Merits Award to include new customers—that the district court had correctly vacated the Remedy Award on this basis.  *Verizon*, 13 F.4th at 312.  That was because the Remedy Award did not limit its application to "existing customers" as the Merits Award had done, and so in that way the Remedy Award had wrongly "expanded the work assignment identified in the Merits Award."  *Id.* at 312-13.  This also amounted to a violation of the *functus officio* doctrine.  *Id.* at 313.

*Standard, Inc. v. United Elec., Radio & Mach. Workers of Am., Local 610*, 900 F.2d 608, 612 (3d Cir. 1990).  Pursuant to the complete arbitration rule, courts are discouraged from "piecemeal" review of an arbitration until all of the substantive issues that an arbitrator has been empowered to address have been completely resolved.  *Id.* at 610-12; *see also PG Publ'g, Inc. v. Newspaper Guild of Pittsburgh*, 19 F.4th 308, 322 (3d Cir. 2021); *Public Serv. Elec. & Gas Co. v. Sys. Council U-2, Int'l Brotherhood of Elec. Workers, AFL-CIO*, 703 F.2d 68, 70 (3d Cir. 1983).[7]
The purpose behind this rule is to prevent the type of "'fragmented litigation'" that would often occur if a federal district court (and an appellate court) were to entertain petitions for relief as to arbitral decisions that resolved less than all issues before an arbitrator.  *Union Switch*, 900 F.2d at 611.  For example, were an arbitrator to make a ruling on a liability issue, and were the losing side permitted to bring that dispute before a district court for resolution, then even if the district court upheld the arbitrator's ruling, the matter might still need to go back before the arbitrator for an additional decision on a remedy (assuming the parties were not otherwise able to agree on the appropriate remedy).  *Id.* at 610-11.  And if a party then appealed the arbitrator's later-issued remedy-related decision, the district court (and possibly an appellate court) would need to make a second assessment of the arbitrator's work before the entire controversy could be put to bed. *Id.*  The complete arbitration rule seeks to prevent this type of inefficiency, by having all disputes before an arbitrator resolved at one time by the court system.

Here, there is no dispute that the Third Circuit has recognized the vitality of the complete arbitration rule.  *Id.* at 610-12; *see also PG Publ'g, Inc.*, 19 F.4th at 322.  Nor can it be disputed

---

[7]      In assessing whether an award in fact amounts to a complete determination of all claims submitted to an arbitrator, pursuant to the complete arbitration rule, the Third Circuit considers whether the arbitrators intended for the award to be a final award.  *See e.g.*, *Robinson v. Littlefield*, 626 F. App'x 370, 374 (3d Cir. 2015).

that had one of the parties appealed the liability decisions in the Interim Award immediately after that award was issued, the district court could have rejected the appeal (were it asked to do so) by concluding that the Interim Award was not "final" for purposes of the complete arbitration rule.

The problem for Respondents is that the Third Circuit has not treated the question of "finality" as applied to the complete arbitration rule in the same way as "finality" is assessed for purposes of the *functus officio* doctrine.  Indeed, to the contrary, the Third Circuit has treated these two "finality" assessments quite differently.  (D.I. 41 at 2)  *Verizon* makes this very plain. There, the Court found that the *functus officio* doctrine applied to the Merits Award, even though that award was only a "partial decision" on all of the issues before the arbitrators; this was because the Merits Award had "*finally* resolve[d] some, but not all, of the submitted issues" (i.e., it had finally resolved at least all liability issues before the Court, but not issues relating to what were the appropriate monetary damages).  *Verizon*, 13 F.4th at 308 (emphasis added).  But on the other hand, when the Merits Award was issued in *Verizon*, the matter was not "final" for purposes of the complete arbitration rule—such that Verizon could not then have immediately appealed the Merits Award-related decision to the district court.  Instead, Verizon had to wait to appeal until both the Merits Award and the Remedy Award were issued, in order to comply with the dictates of the complete arbitration rule.  *See Verizon Penn. LLC v. Commc'ns Workers of Am.*, 216 F. Supp. 3d 530, 531 (E.D. Pa. 2016) (district court granting a motion to dismiss the case when Verizon appealed the Merits Award after that award was issued, but at a time prior to

the issuance of the Remedy Award, since the open remedy issues meant that the Merits Award

was not "final" for purposes of the complete arbitration rule).[8]

Perhaps unsurprisingly then, in support of their argument that the *functus officio*

doctrine's rule on finality should work the same way as does the finality standard for the

complete arbitration rule (i.e., that there is only a "final" award when all submitted issues before

the arbitrator have been fully resolved), Respondents rely almost exclusively on authority from

outside the Third Circuit.[9]  (D.I. 35 at 13 (citing *Employers' Surplus Lines Ins. Co. v. Global*

---

[8]     The fact that the Third Circuit sees a distinction between how finality is treated for purposes of the complete arbitration rule and the *functus officio* doctrine is not a recent phenomenon.  And it did not originate with the decision in *Verizon*.  To the contrary, the Third Circuit has long recognized this distinction.  *See Teamsters Union Local No. 115 v. DeSoto, Inc.*, 725 F.2d 931, 940 (3d Cir. 1984) (recognizing that once an arbitrator decides an issue, he or she is *functus officio* to re-visit it, but also noting that an arbitrator may later address a different issue that had been submitted to her but not yet taken up, and explaining that a district court will not address an arbitrator's award when it "constitutes only a partial resolution of the issues"); *see also District 1199C v. Genesis Healthcare*, Civil Action No. 08-1791 (NLH), 2008 WL 5116899, at *3 & n.2 (D.N.J. Dec. 2, 2008) (recognizing this as the state of the law in the Third Circuit).

[9]     Respondents do cite to one opinion from a district court located in the Third Circuit:  *Shore Point Distrib. Co. v. Int'l Brotherhood. of Teamsters Local 701*, No. 17-CV-01950 (PGS), 2017 WL 5473454 (D.N.J. Nov. 14, 2017)—a decision from the United States District Court for the District of New Jersey.  Respondents assert that in *Shore Point*, the court stated that the standard for determining finality for purposes of the complete arbitration rule is the same as the one for determining finality for purposes of the *functus officio* doctrine.  (D.I. 35 at 13)  The Court, however, finds Respondents' reliance on *Shore Point* to be misplaced.

In *Shore Point*, the arbitrator, following his or her determination on liability (i.e., that the plaintiff had violated the terms of a collective bargaining agreement), formulated a methodology for assessing an appropriate amount of damages.  2017 WL 5473454, at *2.  The arbitrator then advised the parties to try to reach an agreement on the amount of the award using this methodology.  *Id*.  When the parties were unable to reach agreement on a final calculation of damages, the arbitrator agreed to resolve the dispute.  *Id.* at *3.  However, before the arbitrator could do so, the losing party filed a petition to vacate the award with the district court.  *Id.*  The district court concluded that the petition was untimely because the arbitrator's award was not final, pursuant to the complete arbitration rule.  *Id.* at *4.  This was because although the arbitrator had set forth a formula that the parties should use for determining the amount of the

*Reinsurance Corp.-U.S. Branch*, No. 07 Civ. 2521(HB), 2008 WL 337317, at *4 (S.D.N.Y. Feb. 6, 2008)); *id.* at 14 (citing *Bosack v. Soward*, 586 F.3d 1096, 1103 (9th Cir. 2009)); *id.* at 17 (citing *Legion Ins. Co. v. VCW, Inc.*, 198 F.3d 718, 720 (8th Cir. 1999))  It is not entirely clear to the Court that every one of these out-of-jurisdiction opinions actually stand for this proposition. *See, e.g.*, *Bosack*, 586 F.3d at 1103 (deeming an interim award to be "final" for *functus officio* purposes, even though it resolved less than all submitted issues before the arbitrator); *Legion*, 198 F.3d at 720 ("[A]n order does not have to be final in all aspects for the *functus officio* doctrine to apply.").  But even if they did, it is the law of the Third Circuit that controls here— not the law as set out by these other out-of-Circuit courts.[10]

---

remedy, "the precise calculation of the remedy concerns a number of shifts of employees over a long period of time" and "[e]ven reasonable people" could have disagreed about how to use the arbitrator's methodology in order to determine a final damages number.  *Id.*  As a result, a further ruling from the arbitrator was required, and "[u]ntil that [a]ward is finalized, the arbitration process [remained] incomplete."  *Id.*  Yet while the *Shore Point* Court assessed whether the award at issue was final for purposes of the complete arbitration rule, it did not clearly address how this "finality" determination squared with the way the Third Circuit interprets "finality" for purposes of the *functus officio* doctrine.  Indeed, the *Shore Point* Court only mentioned the concept of *functus officio* briefly in its opinion—and even there, it did so only in reference to how the arbitration rules of the New Jersey State Board of Mediators interpreted the *functus officio* doctrine—not how the Third Circuit viewed the doctrine.  *Id.* at *3.  The *Shore Point* Court never went on to analyze the *functus officio* doctrine in any real detail, including as to how it would have applied to the facts in the case before it.  (D.I. 41 at 5 n.2)

[10]      Contrary to what Respondents suggest, (*see* D.I. 35 at 17), it does make sense that a court like the Third Circuit might treat the assessment of "finality" differently in the context of the complete arbitration rule as compared to the *functus officio* doctrine.  That is because the two judicial doctrines serve different purposes.  As noted above, the complete arbitration rule is a prudential doctrine meant to prevent against piecemeal litigation, informed by the premise that efficiency would be best served by having all substantive disputes in the entire arbitration matter assessed at one time by the federal courts.  The "finality" concerns relating to the *functus officio* doctrine, in contrast, are largely focused on a different consideration:  helping to ensure that an arbitral decision on an issue, once made, is not unduly susceptible to later alterations that might undermine confidence in the decision-making process.  In other words, the former doctrine is focused on an arbitrator's *entire award* and the path that the parties take to get to one, efficiently-obtained appellate decision regarding that award.  And the latter doctrine relates not to an

Second, Respondents argue that *Verizon* itself does not "stand[] for the proposition that an award can be final [for purposes of the *functus officio* doctrine] without addressing damages[.]" (D.I. 35 at 16) In doing so, Respondents point out that in the Merits Award in *Verizon*, not only did the arbitrators conclude that Verizon was liable for violating the CBA (by implementing a process for delivering set-top boxes to customers via common carrier for installation), but they also ordered Verizon to "'cease and desist from delivery of [the] set[-]top boxes by anyone other than' Union employees." 13 F.4th at 305 (citation omitted) (*cited in* D.I. 35 at 16). Respondents then claim that since this remedy-related question (i.e., "whether non-union personnel could continue to deliver the boxes") was the "core" or "primary" issue in the *Verizon* arbitration, and since the arbitrators resolved that injunctive relief issue in the Merits Award along with their decision on liability, then in reality, the arbitrators *had* addressed all the "core" submitted liability and remedy questions in the Merits Award—and had left open only the "'ancillary'" issue of monetary damages to be addressed by the Remedy Award. (D.I. 35 at 16) In other words, here Respondents are: (1) asserting that *Verizon* is entirely consistent with the proposition that an award is final for *functus officio* purposes only when it resolves questions of both liability and remedy by (2) ignoring the fact that the arbitrators in *Verizon* had not addressed

---

arbitrator's entire award, but instead to *each of the individual issues* that were before the arbitrator; in doing so, it strives to protect the sanctity of the decision-making process as to each of those issues. So it seems perfectly understandable why one of those doctrines might treat the concept of what is a "final" decision differently from the other.

But whatever the merit of the Third Circuit's different approach to finality with regard to these two judicial doctrines, the main point here is that *this is the Third Circuit's approach*. It is the Court's duty to faithfully apply Third Circuit precedent to cases before it, like this one, where Third Circuit law controls. *See Singleton v. Harry*, CIVIL NO: 1:13-CV-02711, 2020 WL 7366365, at *12 (M.D. Pa. Sept. 21, 2020); *Invista S.a.r.l. v. Rhodia S.A.*, Civil No. 08-941 (RBK/JS), 2009 WL 1439407, at *5 n.2 (D. Del. May 20, 2009).

monetary damages in the Merits Award—and doing so on the ground that this monetary damages issue was simply an "ancillary" issue to the *Verizon* arbitration, such that it should not count for purposes of assessing finality.  (D.I. 35 at 15-17; *see also* D.I. 39 at 3-4)

Respondents' argument, however, is simply not in harmony with the *Verizon* opinion.  It is true that in *Verizon*, the Third Circuit did refer to the monetary damages issue addressed in the Remedy Award as an "ancillary issue[.]"  13 F.4th at 309.  But nowhere did the Court suggest that this reference (nor the relative import of that issue as compared to the requested injunctive relief in the case) had anything to do with its decision on the reach of the *functus officio* doctrine. To the contrary, the *Verizon* Court's point was that because the Merits Award had *entirely* resolved at least *certain issues*—i.e., those relating to liability, or the "scope of the work assignment"—the arbitrators were *functus officio* to later re-visit *those very same liability issues*. *Id*. at 308.  Whether the issue of monetary damages in *Verizon* was an "ancillary" issue or a "core" issue—as compared to the import of all of the other issues that arbitrators there had before them—was simply immaterial to the *Verizon* Court's *functus officio*-related holding.  This all makes clear that, contrary to Respondents' argument, in *Verizon* the Third Circuit:  (1) did *not* suggest that all liability and remedy issues had been finally resolved in the Merits Award; (2) did *not* suggest that all liability and remedy issues must be decided before the *functus officio* doctrine can take effect; and (3) indeed held the opposite—that once an arbitrator decides a particular liability issue, that decision is final, and the arbitrator may not re-evaluate it.

The Court thus concludes that, pursuant to Third Circuit case law, an arbitrator's decision on a liability issue is "final" for purposes of the *functus officio* doctrine, even if the arbitrator has not yet resolved some or all of the parties' submitted disputes regarding damages.

### 2.    Was the Interim Award Final Such That *Functus Officio* Could Apply?

So the Court has now determined that the *functus officio* doctrine applies to partial

decisions that finally resolve some issues (e.g., liability issues) but not others (e.g., damages

issues).  The Court thus turns to the next disputed question here:  Was the Interim Award in fact

a "final award" as to all liability issues put before the Panel—including the Provasi DRIP

issue—such that the *functus officio* doctrine could apply to such issues after the Interim Award

was executed?[11]  For the following reasons, the Court concludes that it was.

---

[11]    The Court pauses here to address another issue that Respondents raised regarding the *functus officio* doctrine:  whether the doctrine even exists any more.  Relying on a decision issued while the parties were in the midst of completing their briefing, Respondents contend that the *functus officio* doctrine was effectively overruled by the Supreme Court of the United States in *Morgan v. Sundance, Inc.*, 142 S. Ct. 1708 (2022).  (D.I. 39 at 2-3; *see also* D.I. 38 at 1-2)  In *Morgan*, the Supreme Court rejected a judge-made rule—designed by judges to advance a purported FAA policy "'favoring arbitration'"—stating that in order for a party to demonstrate that its adversary had waived its right to seek a stay of district court litigation in favor of arbitration pursuant to the FAA, that party had to demonstrate that the adversary's actions had actually caused it prejudice.  142 S. Ct. at 1711.  This "prejudice" requirement was not a feature of federal waiver law generally, and it existed in the courts only in the arbitration context.  *Id.* at 1712.  The Supreme Court explained that the "FAA's 'policy favoring arbitration' does not authorize federal courts to invent special, arbitration-preferring procedural rules."  *Id.* at 1713 (citation omitted).  Indeed, the *Morgan* Court noted that the actual policy reflected in the FAA's text is to make "'arbitration agreements as enforceable as other contracts, but not more so.'"  *Id.* (citation omitted).  Thus, *Morgan* explained that while a court "must hold a party to its arbitration contract just as the court would to any other kind[,] a court may not devise novel rules to favor arbitration over litigation."  *Id.*

Respondents acknowledge that *Morgan* does not specifically reference or address the *functus officio* doctrine.  But they argue that "[t]he Supreme Court's holding in *Morgan* is clearly irreconcilable with Third Circuit precedent [set out in, *inter alia*, *Verizon*] requiring the application of the *functus officio* doctrine, which is a[ judge-made,] arbitration-specific procedural rule."  (D.I. 39 at 2)  Thus, in Respondents' view, *Morgan* effectively overruled the *functus officio* doctrine.  (*Id.* at 3)

It is true, as Respondents note, (*id.* at 2), that "'[c]ircuit precedent, authoritative at the time that it issued, can be effectively overruled by subsequent Supreme Court decisions that are closely on point, even though those decisions do not expressly overrule the prior circuit

To start, the Court turns back to *Verizon*.  As noted above, there the Third Circuit assessed whether the arbitrators had actually "decided the self-installation issue" (that is, whether the arbitrators had actually held, in the Merits Award, that "self-installation did not violate the CBA").  *Verizon*, 13 F.4th at 308.  Ultimately, the Third Circuit concluded that the Merits Award had in fact addressed and provided a final decision as to this issue.  *Id.*; *see also id.* at 309 (referring to this issue as one the arbitrators had "already decided").  And in support of this conclusion, the *Verizon* Court cited to the content of the arbitrators' relevant awards—that is, to what the arbitrators had written in the opinion accompanying the Merits Award, as well as what

---

precedent'"—including when the Supreme Court has "'undercut the theory or reasoning underlying the prior circuit precedent in such a way that the cases are clearly irreconcilable.'" *Power Integrations, Inc. v. Fairchild Semiconductor Int'l, Inc.*, Civil Action No. 04-1371-LPS, 2018 WL 4804685, at *1 n.1 (D. Del. Oct. 4, 2018) (quoting *Miller v. Gammie*, 335 F.3d 889, 899 (9th Cir. 2003) (en banc)); *see also United States v. Russell*, 564 F.3d 200, 204 (3d Cir. 2009).  But the Court is not prepared to say that the Supreme Court's decision in *Morgan* is "clearly irreconcilable" with prior Third Circuit precedent recognizing the applicability of the *functus officio* doctrine.  The Court comes to that conclusion in part because, so far as it can tell, in the year since *Morgan* issued, no court has concluded that *Morgan* put an end to the *functus officio* doctrine.  And it also does so in part because since *Morgan*, numerous federal appellate and district court decisions, including one from this Court, have continued to apply the *functus officio* doctrine.  *See, e.g.*, *Smarter Tools Inc. v. Chongqing SENCI Import & Export Trade Co., Ltd.*, 57 F.4th 372 (2d Cir. 2023); *Cornfield Grp., LLC v. Certain Underwriters at Lloyd's, London*, Case Number: 21-62510-CIV-MORENO, 2022 WL 17480934 (S.D. Fla. Dec. 6, 2022); *Sapp v. Indus. Action Servs., LLC*, Civil Action No. 19-912-RGA, 2022 WL 1690938 (D. Del. May 26, 2022).  But additionally, it so concludes because the *functus officio* doctrine does not appear to be the type of rule that *Morgan* called out as problematic.  For one thing, the *functus officio* doctrine is not a rule (like that in *Morgan*) that prefers arbitration to litigation in a manner that is antithetical to the wording of an applicable statute (e.g., the FAA).  Additionally, although the *functus officio* doctrine may be an "arbitration-specific" rule, the Court does not read *Morgan* as saying that every legal rule that only applies in the arbitration context is verboten.  There are plenty of legal issues that only come up in the arbitration context.  And so it makes sense that there might be certain legitimate legal doctrines or rules that address that context specifically.  Instead, *Morgan* seems to be saying that if there is a legal concept or rule of procedure (i.e., waiver) that applies to both arbitration and non-arbitration cases, that concept should be applied the same way to both sets of cases (unless a federal statute requires otherwise).

they had written in the Remedy Award itself.  *Id.*; *see also Day & Zimmerman, Inc. v. SOC-SMG, Inc.*, Civil Action No. 11-6008, 2012 WL 5232180, at *7 (E.D. Pa. Oct. 22, 2012) ("Furthermore, the Panel made it clear that no final decision had been made on the issue of attorneys' fees in its Award, thus, *functus officio* does not apply.").

Here, the Court concludes that with the Interim Award, the Panel finally decided all issues of liability presented to it, including the Provasi DRIP issue.  To come to that conclusion, just as in *Verizon*, the Court need look no further than what the Panel wrote in the text of the Interim Award itself.

To begin with, in the "Introduction" section of the Interim Award, the Panel stated that it intended to address therein every issue that has been put before it except "attorneys' fees and an updated damages calculation[.]"  (D.I. 4, ex. 3 at 2)  The Panel then wrote that although it would "not address each such argument" in writing in the Interim Award, it had "fully considered *all* arguments raised[,]" and that "[t]he fact that [the Panel did] not address some arguments in the ensuing discussion does not mean that such arguments were not fully considered[.]"  (*Id.* (emphasis added))

Thereafter, in the "Holding" section, the Panel:  (1) stated its conclusion that Prospect breached the Third Agreement by excluding Fees owed to Respondents regarding "DRIP shares in lieu of cash dividends that would have otherwise been due on the shares for which Destra Capital Investments, LLC ('DCI') served as sub-wholesaler"; (2) ordered Prospect to pay certain categories of damages to Respondents regarding the "above-described DRIP shares"; and (3) stated that "[a]ll other claims and relief sought are dismissed[.]"  (*Id.* at 4-5)  And in the final section of the Interim Award (which is, confusingly, also titled "Interim Award"), after giving the parties direction on how to address outstanding issues regarding the calculation of damages

31

and attorneys' fees, costs and expenses owed, the Panel again stated that "[a]ll claims not addressed herein are denied." (*Id*. at 17-18)  Nowhere in the Interim Award does the Panel suggest that any presented liability issue was not meant to be fully adjudicated therein.  (*See also id*., ex. 5 at 1-2 (Panel referring to the Provasi DRIP issue as a "claim [that was] already decided" by the Interim Award, and noting in its supplemental Order that it was simply "mak[ing] . . . clear" the import of that earlier decision))[12]

Therefore, as in *Verizon*, here the Court concludes that the Interim Award was a final decision on the scope of liability in the matter (though it reserved decision on other issues, such as a monetary damages calculation and an assessment of owed attorneys' fees, costs and expenses).  Upon issuing this final decision with respect to liability issues, the Panel was barred from revising a decision on any such issue, including the Provasi DRIP issue, by the *functus officio* doctrine—unless a recognized exception to the doctrine applies.

---

[12]    Respondents argue that the "Panel [d]id [n]ot [i]ntend the Interim Award to [b]e a [f]inal [a]ward." (D.I. 35 at 14)  But in doing so, Respondents are not really suggesting that there is any question as to whether with the Interim Award, the Panel purported to finally decide all *liability issues* before it.  The Panel clearly meant to do so and said it was doing so many times, as noted above.  What Respondents are really doing here is re-making their argument discussed above in Section III.A.1:  that the Interim Award was not a "final" award because it "did not determine a remedy, and contemplated the submission of additional evidence [as to remedy-related issues]" that would be addressed in a further final award.  (*Id*.)  Yet as the Court explained above, an award can be final *as to a liability issue* if it finally resolves *that issue*, even if an arbitral panel leaves for another day certain *other* issues presented to it (like damages-related issues).

Respondents also suggest that the Interim Award's title is an indicator that it did not amount to a final award as to all liability issues.  (*Id*.)  As Prospect notes however, (D.I. 37 at 5), such a detail has little impact here, as "[t]he content of [an arbitral] decision—not its nomenclature—determines finality."  *Publicis Commc'n v. True N. Commc'ns, Inc.*, 206 F.3d 725, 728-29 (7th Cir. 2000); *see also Sarl v. A.M. Todd Co.*, Civil Action No. 07-2727, 2009 WL 2526432, at *4 n.6 (E.D. Pa. Aug. 18, 2009).

**B.      Do the Revised Interim Award and Final Award Fall Within an Exception to *Functus Officio* and Do They Comply With Rule 50?**

So the Court has now concluded that the Interim Award provided a final decision on the

Provasi DRIP issue (and all other liability issues), and thus that the *functus officio* doctrine would

apply to that decision, unless an exception to the doctrine is applicable.  Now then the Court

must consider:  (1) whether such an exception to *functus officio* applies—such that the Panel's

analysis in the Revised Interim Award and accompanying Order (in which it clarified that

Prospect was liable for Fees on Provasi-related DRIP shares) and the related Final Award can

impact the outcome here; and (2) whether the Revised Interim Award and Final Award violates

Rule 50.

**1.      Exceptions to the *Functus Officio* Doctrine**

The Court first addresses the exceptions to the *functus officio* doctrine.  There are three

such exceptions that have long been recognized by the Third Circuit:

> (1) [A]n arbitrator can correct a mistake which is apparent on the
> face of his award; (2) where the award does not adjudicate an issue
> which has been submitted, then as to such issue the arbitrator has
> not exhausted his function and it remains open to him for
> subsequent determination; and (3) where the award, although
> seemingly complete, leaves doubt whether the submission has been
> fully executed, an ambiguity arises which the arbitrator is entitled
> to clarify.

*Verizon*, 13 F.4th at 307 (internal quotation marks and citations omitted).

Respondents assert that the clarifications in the Revised Interim Award and Final Award

fall within the second and third exception to the *functus officio* doctrine.[13]  Below the Court will

---

[13]      Respondents do not raise arguments regarding the first exception.  Thus they do
not appear to dispute that the first exception is inapplicable here.  (D.I. 41 at 10 (Prospect noting
that Respondents "do not argue that the Award contained a mistake which is apparent on the face
of [the] award") (internal quotation marks and citations omitted); *see also* D.I. 37 at 11 n.2)

explain why it agrees with Respondents that the Panel's clarifications were proper pursuant to the third exception.[14]

The third exception to the *functus officio* doctrine arises when a seemingly complete award nevertheless leaves doubt as to whether the submission has been fully executed, thus resulting in an ambiguity that an arbitrator is entitled to clarify. *Verizon*, 13 F.4th at 307; *see also Colonial Penn Ins. Co. v. Omaha Indem. Co.*, 943 F.2d 327, 332 (3d Cir. 1991). An award is ambiguous "'when the award fails to address a contingency that later arises or when the award is susceptible to more than one interpretation.'" *Sterling China Co. v. Glass, Molders, Pottery, Plastics & Allied Workers Local No. 24*, 357 F.3d 546, 554 (6th Cir. 2004) (quoting *Green v. Ameritech Corp.*, 200 F.3d 967, 977 (6th Cir. 2000)); *see also Accuride Erie L.P. v. Int'l Union, United Auto., Aerospace & Agric. Implement Workers of Am., Local Union 1186*, Civil Action No. 05-169 Erie, 2009 WL 426661, at *3 (W.D. Pa. Feb. 20, 2009) (noting that an award is ambiguous for purposes of the third *functus officio* exception if it "is susceptible to more than one interpretation"). An ambiguity in the award may be shown not only from the face of the award, but also from extraneous but objectively ascertainable facts. *Colonial Penn Ins. Co.*, 943 F.2d at 334; *Pittsburgh Metro Area Postal Workers' Union, AFL-CIO v. U.S. Postal Serv.*, Civil Action No. 07-00781, 2008 WL 1775502, at *11 (W.D. Pa. Apr. 16, 2008). "Where an arbitrator has actually decided an issue but the ruling is ambiguous, [a court] defer[s] to the arbitrator's *post hoc* interpretation of his award only if it is a *rational* clarification of the ambiguity; otherwise, the arbitrator is revising the award, not clarifying it." *Verizon*, 13 F.4th at 309 (emphasis in original); *cf. Gen. Re Life Corp. v. Lincoln Nat'l Life Ins. Co.*, 909 F.3d 544, 549

---

[14] Given the Court's decision, it need not and will not address Respondents' arguments as to the second exception.

(2d Cir. 2018) (explaining that a supplemental award clarifying an earlier award violates the *functus officio* doctrine unless "the clarification merely clarifies the award rather than substantively modifying it") ("*Gen. Re Life II*"); *Sterling China*, 357 F.3d at 556 ("[T]he arbitrator's authority allows for clarification of an award subject to multiple interpretations[.]").

Here, there is no dispute that the Panel had been presented with the issue of whether Respondents were entitled to Fees resulting from Provasi-sold DRIP shares.  (D.I. 3 at 4; D.I. 35 at 23)  The disputed question is whether the Interim Award's language is ambiguous as to whether Prospect or Respondents prevailed on the Provasi-sold DRIP shares issue.  Or, put differently, is the Interim Award reasonably "susceptible to more than one interpretation" on that score?

This was a difficult question to answer.  In part, that is because there are certainly many aspects of the Interim Award that could lead a reasonable reader to conclude that therein, the Panel was ruling that Prospect was liable with regard to DCI-related DRIP share Fees, but was *not* liable as to any other of Respondents claims, including those relating to Provasi-sold DRIP shares.  Among this evidence is the following:

- In what is probably the single most compelling part of the record in Prospect's favor, in the Interim Award's Holding section, the Panel begins by stating that "[Prospect] has breached the Third Agreement by not calculating the [F]ees such that the Stratera Fee Party Shares and Destra Fee Party Shares included DRIP shares in lieu of cash dividends that would have otherwise been due *on the shares for which Destra Capital Investments ('DCI') served as sub-wholesaler*[.]"  (D.I. 4, ex. 3 at 4-5 (emphasis added))  Then, after going on to explain what general types of damages Prospect must pay as a result of this breach as to the "above-described DRIP shares[,]" the Panel concludes the section by noting that "*[a]ll other claims and relief sought are dismissed*."  (*Id.* at 5 (emphasis added))  In other words, in the award's Holding section—a section where the Panel might be expected to most clearly state

35

which side wins and loses on key issues—the Panel never mentions the Provasi DRIP share issue explicitly, and instead only explicitly states that Respondents prevailed on the DCI DRIP share issue. This could understandably lead a reader to conclude that Respondents' claim for Fees regarding Provasi DRIP shares was one of the "[a]ll other claims" that the Panel ruled were dismissed.

- In a number of instances in its "Findings of Fact" and "Conclusions of Law" sections, the Interim Award makes pointed reference to the fact: (1) certain language in the Third Agreement required that in order for Respondents to be eligible to obtain certain Fees, it was required that "DCI acts as a sub-wholesaler" or that "DCI [was] acting as a sub-wholesaler" and/or (2) noted that "DCI assisted investors regarding the decision to choose DRIP shares instead of a cash dividend, and thus it can reasonably be said that the issuance of DRIP shares was through DCI acting as a sub-wholesaler." (*Id*. at 8-14) These references were clearly meant to support the Panel's conclusion that Prospect was liable for payment of Fees relating to *DCI DRIP shares*, because those types of shares are in fact shares as to which DCI acted as a sub-wholesaler in the transaction. And there is no similar reference in the Interim Award to Provasi's role as a wholesaler with regard to DRIP shares. (D.I. 4, ex. 5 at 2 (Panel noting that in the Interim Award, it "referred specifically only to fees on DRIP shares flowing from shares issued through DCI as sub-wholesaler")) The fact that there is so much focus on DCI and its role in these sections—and no real focus at all on Provasi and its (similar) role prior to May 2018—could be read to mean that with these "DCI sub-wholesaler" references, the Panel meant to further underscore that the DCI DRIP issue was the only issue on which Respondents should prevail.

- Since the Provasi DRIP issue was one of the few legal issues that the Panel was asked to decide, the simple fact that the Interim Award did not explicitly mention that issue could be problematic for Prospect. Put differently, if the Panel was tasked with resolving only a few questions, one of them being the Provasi DRIP issue, then one might normally expect the Interim Award to discuss that issue in some detail. And so because the Panel did *not* clearly and explicitly mention that issue, this might be said to create an ambiguity (one suggesting, for example, that the Panel might have felt it had addressed the issue by virtue of the reasoning it used to resolve

the related DCI DRIP issue).[15]  But the Interim Award does
provide Prospect with a basis to explain away the Panel's
failure to explicitly mention the Provasi DRIP issue—in a
manner suggesting that the Panel's silence was actually the
means by which the Panel meant to *deny* relief to Respondents
on the issue.  This is because in the Introduction section of the
Interim Award, the Panel notes that the parties "have not
requested a reasoned award[,]" such that if the Panel did "not
address some arguments in the ensuing discussion [that did]
not mean that such arguments were not fully considered by
[it]."  (*Id.*, ex. 3 at 2)  Understanding this, and also seeing that
the Panel later reiterated that any "claims not addressed herein
are denied[,]" (*id.* at 18), Prospect can reasonably argue that
the Panel's silence as to Provasi DRIP, strange as it may seem,
was simply a way of *efficiently denying* Respondents' claim
regarding that issue.

Again, all of these aspects of the record are helpful to Prospect's case.  But after careful

consideration of the entire record before it, the Court nevertheless concludes that the Interim

Award is in fact ambiguous as to which side prevailed as to the Provasi DRIP claim.  To that

end, there *is* evidence supporting the assertion that with the Interim Award, the Panel was

conveying that *Respondents* had won on that claim.  And so, this is a case where the Interim

Award, although at first blush seemingly complete, nevertheless leaves sufficient doubt as to

who was the victor as to this issue.  The Court so concludes for the following six reasons.

First, Section 1.b of the "Conclusions of Law" section of the Interim Award ("Section

1.b")[16]—and the way in which it describes the issues that it is discussing therein—provides some

support to Respondents' position.  Section 1.b reads as follows:

---

[15]    Indeed, below, the Court will rely on this as a factor that supports the applicability
of the third exception.  *See infra* at 44-45.

[16]    Here, as it will a few other times in this portion of its opinion, the Court cites to
content drawn from the Interim Award's eight-page "Conclusions of Law" section.  Prospect
argues that Respondents should not be able to rely on any sections of the Interim Award outside
of the "Holding" section in addressing the question of ambiguity.  (D.I. 37 at 7-8)  To be sure,

b.  Because of the ambiguity in the Third Agreement, parol evidence is admissible to determine the expectations that formed the basis of the contractual relationship.  We find that parole evidence supports Claimants' [i.e., Stratera and Destra's] position that the calculation of the Applicable Fee Party Percentages must include fees on DRIP shares.

i.  The parties' negotiations demonstrate that Claimants expected to be paid on DRIP shares and that Prospect knew of their expectation.  Because Prospect created Schedule 11.18 in such a manner as to confirm Claimants' expectation concerning the allocation of fees, which included fees on DRIP shares, Prospect is deemed to have accepted the inclusion of DRIP shares notwithstanding the provisions in the Third Agreement that might otherwise be interpreted to exclude DRIP shares because they were not "issued in the Offering".

ii.  For as long as DRIP shares are issued in lieu of a cash dividend to investors whose shares were issued through DCI as a sub-

---

the Holding section is an important part of the Interim Award in this context.  But for a few reasons, the Court easily rejects the premise that no other portion of the Interim Award could be useful in assessing the ambiguity question here.  For one thing, the Holding section is not the only portion of the Interim Award that provides a window into the Panel's legal reasoning.  The Conclusions of Law section does this as well.  As Respondents note, (D.I. 39 at 5-6), some of the wording in the Conclusions of Law section looks and reads like a statement of the Panel's legal holdings and its ultimate conclusions.  Additionally, Prospect itself points to sections of the Interim Award other than the Holding section in order to bolster its case.  (*See, e.g.*, D.I. 37 at 3-6)  If other portions of the Interim Award are relevant when they support *Prospect's* point of view, then it stands to reason that they could also be relevant if they were to help *Respondents'* case instead.  Lastly, the case law notes that ambiguity in this context can be demonstrated in various ways—even by reference to facts *extraneous* to an arbitrator's award.  *See e.g.*, *Colonial Penn Ins. Co.*, 943 F.2d at 334; *see also Gen. Re Life Corp. v. Lincoln Nat'l Life Ins. Co.*, 273 F. Supp. 3d 307, 322 (D. Conn. 2017) ("*Gen. Re Life I*").  If that is so, then it is hard to see why other portions of the *arbitrators' award itself* (even if they are not found in the "Holding" section of that award) could not be viable grist for the mill.

Relatedly, Prospect also attacks Respondents' position by arguing that "Respondents cannot create ambiguity in an unambiguous holding by arguing, not that the holding was unclear (which no one argues), but instead that the arbitrators' reasoning *should have produced a different holding*."  (D.I. 37 at 7 (emphasis in original); *see also* D.I. 41 at 13)  But as the Court has suggested above, the Holding section of the Interim Award is not the only place in the award where the Panel could have made legal pronouncements that have a bearing on the outcome described therein.

> wholesaler, whether the DRIP shares are issued before or after
> November 2, 2019, we conclude that there is no reason to exclude
> such DRIP shares from being included in the calculation of the
> Applicable Fee Party Percentages.

(D.I. 4, ex. 3 at 13-14)  Of particular import here is Section 1.b's reference to the finding that

"parol evidence supports *Claimants'* [i.e., Stratera and Destra's] position that the calculation of

the Applicable Fee Party Percentages[17] must include [F]ees *on DRIP shares*" and to Section

1.b.i's further repeated discussion of how "*Claimants*" expected to be paid on "*DRIP shares*"

and how Prospect was deemed to have accepted the inclusion of "*DRIP shares*[.]"  (D.I. 4, ex. 3

at 13 (emphasis added); *see also* D.I. 35 at 6; D.I. 39 at 5-6)  In these paragraphs, the Panel is not

facially differentiating between DRIP shares sold by DCI or DRIP shares sold by Provasi;

instead, the Panel simply refers to "DRIP shares" writ large.  And in the arbitration proceeding,

both "Claimants" (that is, both Destra—the entity affiliated with DCI, and Stratera—the entity

affiliated with Provasi) had taken the position that they were owed Fees on "DRIP shares"—

positions that did not differ in any substantive way in terms of whether the shares in question

were *DCI-related* DRIP shares or *Provasi-related* DRIP shares.  (D.I. 36, ex. 1-C at ¶ 1 (Destra

stating that the relief it sought in the arbitration was an "[a]ward to Destra [of] all Management

and Incentive Fees that were collected and improperly retained by Prospect and not distributed to

Destra to date, including, without limitation, those collected on DRIP . . . [s]hares"); *id.*, ex. 1-D

at ¶ 1 (Stratera stating that the relief it sought in the arbitration was an "[a]ward to Stratera [of]

all Management and Incentive Fees that were collected and improperly retained by Prospect and

not distributed to Stratera to date, including, without limitation, those collected on DRIP . . .

---

[17]    The Third Agreement defined "Applicable Fee Party Percentages" as not only
including the "Destra Fee Party Percentage[,]" but also the "Stratera Fee Party Percentage[.]"
(D.I. 4, ex. 1 at § 10.01)

[s]hares[.]"); *id.*, ex. 1-G at 7-12 (Respondents citing to evidence from the arbitration emphasizing how Prospect made no argument in that proceeding that DCI-sold DRIP shares should be treated differently than Provasi-sold DRIP shares))  Indeed, in its own briefing to the Panel, even Prospect lumped together DCI-sold and Provasi-sold DRIP shares, referring to them simply as "DRIP shares[.]"  (D.I. 40, ex. 2-A at 19-23; *see also id.* at 29-30; D.I. 39 at 7-8)  So with all of that as context, when the Panel repeatedly writes in Section 1.b that it is siding with "*Claimants' position*" that the calculation of the Applicable Fee Party Percentages must include Fees on "*DRIP shares*[,]" those statements could reasonably be read as implicating *both* DCI-related and Provasi-related DRIP shares.[18]

Second, and relatedly, the Interim Award is replete with additional references to "DRIP shares" other than those cited above in Section 1.b—references that do not differentiate between DCI-sold DRIP shares or Provasi-sold DRIP shares.  For example, in "The Claims and Relief Sought" section, the Panel twice states that at issue are Fees retained by Prospect including

---

[18]    In rebutting Respondents' suggestion that Section 1.b is favorable to their position, Prospect points to the content of Section 1.b.ii.  Therein, in setting out another basis for its conclusion, the Panel noted that "[f]or as long as DRIP shares are issued in lieu of a cash dividend to investors whose shares were issued *through DCI as a sub-wholesaler*, . . . we conclude that there is no reason to exclude such DRIP shares from being included in the calculation of the Applicable Fee Party Percentages."  (D.I. 37 at 9-10 (quoting D.I. 4, ex. 3 at 14) (emphasis in original))  Prospect's argument is that by specifically referring there to shares issued through "DCI as a sub-wholesaler," the Panel was limiting its discussion of "DRIP shares" in Section 1.b to only DCI-related DRIP shares.  Prospect's argument is an understandable one.  And it could be a reasonable interpretation of this Section.

But in the Court's view, the quoted language only further deepens the ambiguity in the Interim Award.  Did Section 1.b's and 1.b.i's earlier, broader reference to "Claimants'" and "DRIP shares" amount to a reference to both DCI- and Provasi-related DRIP shares?  Or was Section 1.b.ii's narrower reference to "DCI"-related DRIP shares meant to tell us that the only thing being referenced in this section was Respondents' claim to those particular shares?  It is unclear, at least in the Court's eyes.  Reasonable minds could disagree.

40

"without limitation, those collected on DRIP . . . Shares."  (D.I. 4, ex. 3 at 3)  In the "Findings of Fact" section, the Panel quotes a witness who states that Respondents "expected to receive, under the Third Agreement, fees on all assets, including DRIP shares."  (*Id*. at 7)  And in the "Conclusions of Law" section, "DRIP shares" are refenced generally in a number of places.  (*Id*. at 11-12, 16-17)[19]  Since it is undisputed that in the context of this arbitration, there was more than one type of "DRIP shares" at issue (e.g., DCI-related shares and Provasi-related shares), these references could possibly be understood as pointing to DRIP shares having to do with DCI and those having to do with Provasi.  And if that is so, then this intensifies the ambiguity at issue.  *Cf. Int'l Brotherhood of Teamsters, Chauffeurs, Warehousemen & Helpers of Am. v. Silver State Disposal Serv., Inc*., 109 F.3d 1409, 1411-12 (9th Cir. 1997) (concluding that an arbitrator's award, which stated that an employee should be suspended for three days without pay, was ambiguous as to whether the employee should receive back pay, as the arbitrator's failure to explicitly "discuss back pay made an explanation of this omission necessary").

Third, the Panel's heavy reliance on the content of Section 11.18 and Schedule 11.18 of the Third Agreement supports Respondents' position.  In the Interim Award, the Panel concluded that "the Applicable Fee Party Percentages" should be calculated by reference to Section 11.18 and Schedule 11.18.  (D.I. 4, ex. 3 at 13)  Section 11.18, in turn, required that in determining the

---

[19]       The Interim Award also uses the phraseology "above-described DRIP Shares" a number of times.  Sometimes when it does so, the surrounding context makes clear that this is a reference to DCI-related DRIP shares that have been referenced in the immediately preceding sentences.  (*See, e.g*., D.I. 4, ex. 3 at 5)  But in at least one case (in the final "Interim Award" section) the use of this phrase is not immediately proceeded by references only to DCI-related DRIP shares.  (*Id*. at 17 ("[Prospect] shall provide [Respondents] with a calculation of [Respondents'] share of [Fees] collected and improperly retained by Prospect and not distributed to [Respondents] to date on the *above-described DRIP Shares*. . .") (emphasis added))  So this reference to "DRIP Shares" could also reasonably be read as creating ambiguity as to whether it refers to both DCI-sold and Provasi-sold DRIP shares.

amounts of relevant Fee allocations, "the Operating Member shall calculate the Destra Fee Party Percentage, Stratera Fee Party Percentage and P[rospect] Fee Party Percentage in accordance with Schedule 11.18." (*Id.*, ex. 1 at 42)  This meant that *both* Stratera Fee Party Shares and Destra Fee Party Shares were to be calculated in accordance with Schedule 11.18.  (*Id.*, ex. 3 at 13 ("In Schedule 11.18, one cannot calculate the Applicable Fee Party Percentages without calculating the Destra Fee Party Shares and Stratera Fee Party Shares[.]"); *see also id.*, ex. 1 at 30, 34)  According to the Third Agreement and to Schedule 11.18, inherent in the calculation of Stratera Fee Party Shares are two different components:  (1) shares sold by DCI, for which Stratera gets 12.5% credit; and (2) *shares sold by Provasi*, for which Stratera gets 50% credit. (*Id.*, ex. 1 at 34 & Schedule 11.18)  And on its face, Schedule 11.18 makes reference to both types of shares, including those sold by Provasi.  (*Id.*, ex. 1 at Schedule 11.18 (illustrating that Stratera Fee Party Shares ("F") are made up of 12.5% of the shares issued through DCI acting as sub-wholesaler ("C") times 50% of fund shares issued "prior to May 11, 2018" ("B"), which are shares that would necessarily have been sold by Provasi—the only sub-wholesaler through that date))  Therefore, when the Panel concluded (1) that "the calculation of the Applicable Fee Party Percentage must include [F]ees on DRIP shares[,]" (*id.*, ex. 3 at 13), and (2) that the calculation of those Fees should be made in accordance with Schedule 11.18 (which facially applies to Stratera Fee Party Shares that are made up of both DCI-sold *and Provasi-sold* DRIP shares), (*id.*); then (3) the Panel's Interim Award could support the conclusion that Fees should be paid on both DCI and Provasi-sold DRIP shares.  (*See id.*, ex. 5 at 1-2 (Panel noting that "the essence of [its] conclusion was that fees on DRIP shares should be included in the applicable Fee Party Percentage, a conclusion that necessarily applies to DRIP shares flowing from shares issued by Provasi"))

42

Indeed, the Court is not aware of any principled argument that the Panel's rationale as to why Prospect is liable for Fees on DCI-sold DRIP shares *would also not necessarily lead to the conclusion that Prospect should be liable for Fees on Provasi-sold DRIP shares.*[20]  Any reading to the contrary (i.e., that Prospect was liable for Fees on DCI-related DRIP shares, but not liable for Fees on Provasi-related DRIP shares), then, could be understood to result in an award that was contradictory in its outcome as to these two issues.  And courts will not enforce an arbitrator's award that is inherently contradictory.  *See Sheet Metal Workers Int'l Ass'n Local Union No. 420 v. Kinney Air Conditioning Co.*, 756 F.2d 742, 745 (9th Cir. 1985); *Bell Aerospace Co. Div. of Textron, Inc. v. Local 516, Int'l Union, United Auto., Aerospace and Agricultural Implement Workers of Am. (UAW)*, 500 F.2d 921, 923-24 (2d Cir. 1974); *United Steelworkers of Am., Local No. 12886 v. ICI Americas Inc.*, 545 F. Supp. 152, 154 (D. Del. 1982).

Fourth, the fact that the Interim Award so pointedly and repeatedly discusses the facts relating to DCI-related DRIP shares, and yet never once delves into the background facts related to Provasi-related DRIP shares—can actually be seen to help (not hurt) Respondents position in a

---

[20]    Prospect hardly ever suggests otherwise in its briefing.  That said, at one point Prospect did assert that it was "entirely rational" and "logical" that the Panel's decision regarding DCI DRIP share liability would not similarly extend to "shares issued through Provasi":  because "Schedule 11.18—which was the primary basis for Respondents' claim to recovery—describes compensable shares as 'Shares Issued and Outstanding *through Destra Capital Investments LLC acting as sub-wholesaler.*'"  (D.I. 37 at 11 (citing D.I. 4, ex. 1 at Schedule 11.18) (emphasis in original))  But as Respondents argue, and as the Court has noted above, this is simply not an accurate reading of Schedule 11.18.  (D.I. 39 at 9-10)  Although Schedule 11.18 does include the language quoted by Prospect, it facially makes reference to "Stratera Fee Party Shares" and notes that those shares are partly made up of "Fund Shares Issued and Outstanding (Issued prior to May 11, 2018)."  (D.I. 4, ex. 1 at Schedule 11.18)  This can only be a reference to shares issued through Provasi as the Dealer Manager, because DCI did not begin issuing shares until after the Third Agreement (dated May 11, 2018).  (D.I. 39 at 10)

way.[21]  That is because the absence of any specific reference to facts relating to Provasi DRIP

shares or Provasi's role as a sub-wholesaler in the Interim Award seems so hard to fathom.

There is no question that one of the very few legal issues presented to the Panel was whether

Respondents were entitled to Fees relating to Provasi-sold DRIP shares.  And there is no dispute

that Respondents' arguments about why they should prevail on the Provasi DRIP issue were

identical to their arguments as to why they should prevail on the DCI DRIP issue.  When one

understands all of this, and then one sees the Interim Award's constant and continual reference to

facts relating to DCI DRIP shares (and absolutely no reference to facts regarding Provasi DRIP

shares)—one could reasonably start to think:  "Something is very wrong here."  In such

circumstances, a knowledgeable reader could conclude:  "There must be some reason why the

Panel is not specifically mentioning this Provasi DRIP shares issue—it must be because the

Panel considers its discussion of 'DRIP shares' or even 'DCI DRIP shares' to *also be resolving*

the Provasi DRIP shares issue too in Respondents' favor."  In sum, under these unique

circumstances, the Panel's silence regarding the Provasi DRIP issue actually can bolster

Respondents' ambiguity argument.  *Cf. Transtech Indus. v. A&Z Septic Clean*, 270 F. App'x

200, 210 (3d Cir. 2008) ("[The arbitrator's] initial decision had *relatively little to say* about [the

subject of underlying tax liability] and thus his amended decision clarifies ambiguity about [that

subject] in the initial award, qualifying for exception (3) [to the *functus officio* doctrine.]")

(emphasis added).

---

[21]      Technically, the Interim Award does mention Provasi a few times in the Findings
of Fact section, but only to note that Provasi once served as the Dealer Manager that distributed
the Fund's shares, and to explain that Provasi terminated its contract in March 2018.  (D.I. 4, ex.
3 at 6-7)  But the Interim Award never describes any facts relating to Provasi's role in working
with third parties with regard to DRIP shares, or how that might impact the liability-related DRIP
issues before the Panel.

Fifth, although not dispositive, the Court notes that the Panel itself concluded that the Interim Award was ambiguous, and it provided a rational clarification of that ambiguity. *See Verizon*, 13 F.4th at 309 (explaining that once it has been determined that an arbitrator's ruling on an issue is ambiguous, a court will defer to the arbitrator's *post hoc* interpretation of his award if it is a "*rational* clarification of the ambiguity") (emphasis in original). Specifically, the Panel explained in its Order that, given its decision that the Applicable Fee Party Percentages must be calculated using Schedule 11.18, the only possible conclusion to reach from that decision would be that Respondents were due Fees on both DCI-related and Provasi-related DRIP shares. (D.I. 4, ex. 5 at 1-2 (Panel referring to the Provasi DRIP claim as one "already decided" and explaining that in the Revised Interim Award, it was simply "clarifying" the "effect or consequence" of that decision)) However, the Panel explained that its "holding did not *make this latter point clear*, but rather referred specifically only to [F]ees on DRIP shares flowing from shares issued through DCI as sub-wholesaler"; thus, the Panel noted that it had "failed to *make clear* that full effectuation of its intent required a *clear* statement to the effect that the calculation must be based not only on DRIP on shares issued through DCI, but also DRIP on shares issued through Stratera's subsidiary, Provasi." (*Id.* at 2 (emphasis added)) The Panel concluded that this created an ambiguity in the Interim Award that "require[d] clarification." (*Id.* at 4) As noted above, the Court, using its own independent judgment, agrees with that view. And the Panel's conclusion regarding how the ambiguity discussed herein should be clarified is not irrational; indeed, it is in harmony with the overall reasoning applied to an identical legal issue (the DCI DRIP issue).

Sixth, in the Court's view, its decision here is in line with the "policy of judicial restraint that is the thrust of federal arbitral jurisprudence" and amounts to the most sensible outcome.

*Office & Prof'l Emps. Int'l*, 186 F.3d at 331.  In this matter, we have a situation where the parties all agreed that an arbitral body should resolve their disputes.  Three arbitrators were selected and they then wrestled with the factual and legal questions put before them for many months, at great time and expense.  They then issued the Interim Award.  And we now know that in that award, what those arbitrators *thought that they had conveyed* and what they *meant to be conveying* was that Prospect should prevail on the Provasi DRIP issue.  Understanding that, were the Court to issue a decision here that interprets the Interim Award to clearly have the opposite effect, that would simply seem . . . wrong in some fundamental way.  It would mean that Prospect would actually prevail on an issue, when the very arbitrators that Prospect selected to resolve this dispute adamantly felt that the opposite outcome is the right one and believed they had communicated this to the parties.  In the Court's mind, the "policy of judicial restraint" that the Third Circuit has referenced augurs in favor of Respondents' position.  It gives effect to the intent of the arbitrators in a situation where (as here) there is in fact some evidence of ambiguity in the Interim Award regarding the key issue at play.[22]

For all of these reasons, the Court agrees with Respondents that the Interim Award was ambiguous and susceptible to different reasonable interpretations as to whether Prospect was

---

[22]     At times, in contesting Respondents' position, Prospect also argues that the Revised Award must necessarily be understood as expanding the scope of the Interim Award in violation of *functus officio* because Prospect's "liability [increased] more than 20 times from less than $300,000 to nearly $7 million[.]"  (D.I. 37 at 3)  But "proper clarifications [of arbitration awards] can appear to change significantly the relief awarded[.]"  *Gen. Re Life I*, 273 F. Supp. 3d at 323.  And of course, this argument assumes that the Panel did not initially rule in favor of Respondents.  *Local 2322, Intern. Brotherhood of Elec. Workers v. Verizon, Inc.*, No. Civ.A. 04-12490-RWZ, 2005 WL 3160696, at *3 (D. Mass. Nov. 23, 2005) (finding the original award was ambiguous and rejecting the argument that the "clarified award was a '180-degree reversal of the remedy originally rewarded'" because the "clarification could only constitute a 'reversal' o[r] 'alteration' of the original award if I accept Verizon's reading of the original award").

found liable therein for Provasi DRIP-related Fees.  Thus, the Panel was entitled to (and indeed, needed to) clarify its intent under the third *functus officio* exception.[23]  The Panel did so in a rational way with the Revised Interim Award, its accompanying Order, and the related Final Award.

## 2.   Rule 50

In light of this conclusion, the Court also rejects Prospect's argument that the Panel's Revised Interim Award and Final Award violated Rule 50.  That rule states as follows:

> Within 20 calendar days after the transmittal of an award, any party, upon notice to the other parties, may request the arbitrator, through the AAA, to correct any clerical, typographical, or computational errors in the award.  The arbitrator is not empowered to redetermine the merits of any claim already decided.

(D.I. 35 at 20)  Prospect argues that the Panel redetermined the merits of its decision in the Interim Award by thereafter asserting in the Final Interim Award that Prospect was liable for Fees on Provasi-sold DRIP shares.  (D.I. 3 at 19 (Prospect asserting that the Panel did so because it "changed an explicit holding from a denial to a grant of relief" and "rewr[ote] the merits, which it lacked authority to do"))

To the extent that Prospect interprets Rule 50 to mean that an arbitrator may never make any alteration or addition to his or her reasoning in an award other than by correcting "clerical,

---

[23]     *See Pittsburgh Metro Area Postal Workers Union*, 2008 WL 1775502, at *11 (finding the third *functus officio* exception applicable, and that an award that was contradictory on its face was ambiguous as to whether employees on leave during the relevant time periods were included in the award's reference to "appropriate [] employees" or "affected employees," where on the one hand, the arbitrator used seniority rolls that did not include employees on leave when calculating his award, but where on the other hand, the purpose of the award could support inclusion of such persons); *Gen. Re Life I*, 273 F. Supp. 3d at 322-23 (concluding that an award was ambiguous pursuant to the third *functus officio* exception, even though at first glance the key provision appeared to be facially clear, where that reading conflicted with the content of a treaty between the parties and the broader context of the parties' dispute).

typographical, or computational errors," it is incorrect.  This portion of Rule 50 deals only with

what *parties* may request of an arbitrator, and even then, it is permissive, as it uses the term

"may[.]"  The second sentence of the Rule, meanwhile, contains the only limitation on an

arbitrator's power—that is, that an arbitrator may not redetermine the merits of any claim already

decided.  Thus, arbitrators may issue clarifications or additions to their award without running

afoul of Rule 50, so long as those actions are in line with one of the exceptions to the *functus*

*officio* doctrine and do not amount to "redetermin[ing] the merits."  *Cf. Verizon*, 13 F.4th at 307

(reading the three exceptions to the *functus officio* doctrine as operating in harmony with the

requirements of a rule identical to Rule 50) (alteration in original); *see also Imperial Crane*

*Sales, Inc. v. Sany Am., Inc.*, 15 C 859, 2017 WL 4310532, at *3 (N.D. Ill. Sept. 28, 2017)

(stating that Rule 50 "codifies the *functus officio* doctrine"); *Ronald Barranco & Print3D Corp.*

*v. 3D Sys. Corp.*, 3:14-cv-00188-RJC-DSC, 2016 WL 4546449, at *4 (W.D.N.C. Aug. 31, 2016)

(stating that Rule 50 "creates the doctrine of *functus officio*, which prevents an arbitrator from

reexamining the merits of a final award[,]" except with respect to one of the *functus officio*

exceptions); (D.I. 35 at 20-21).  And for the reasons the Court has set out above, here the Panel

clarified an ambiguity in the Interim Award; it did not redetermine the merits of that award.

### 3.   Conclusion

In sum, for the reasons discussed, the Court concludes that Prospect has not met its

heavy burden to demonstrate that pursuant to Section 10(a)(4), the Panel's Revised Interim

Award and Final Award should not be enforced.  Nor has it overcome the extremely deferential

"manifest disregard of the law" standard by demonstrating that the Panel's decision flies in the

face of clearly established legal precedent.  That is because with the Revised Interim Award and

Final Award, the Panel properly clarified an ambiguity in its prior Interim Award—a

clarification that did not run afoul of the *functus officio* doctrine nor Rule 50.[24]  Therefore, the Court recommends that the District Court grant Respondents' Motion to Enforce,[25] and deny Prospect's Motion to Vacate and its Supplemental Motion.

### C.    Attorneys' Fees, Costs, and Expenses

The Court finally turns to Respondents' request for attorney's fees, costs and expenses. Respondents ask that the Court include in its decision an award for such monies incurred in the enforcement of the Final Award, including an estimate for post-trial proceedings, appeals, and collections.  (D.I. 31 at ¶ 115; D.I. 32 at 2-3)  Although some courts have concluded that they have no independent authority under the FAA to award such fees, here, the Third Agreement allows such recovery.  The Third Agreement states:

> Any costs, fees and expenses (including attorney's fees and expenses) incident to enforcing the arbitral award shall be included in any judgment rendered thereon (including an estimate for post-trial proceedings, appeals, collections, etc., the parties agreeing here that the loser shall pay all out-of-pocket and legal expenses of the prevailing party until paid in full following all collections).

(D.I. 4, ex. 1 at 40)

Since the Court has recommended that Respondents' Motion to Enforce be granted, the Court will also recommend that their request for attorneys' fees, costs and expenses be granted as

---

[24]    In light of the Court's decision herein, it need not address Respondents' alternative argument that Prospect implicitly consented to the Panel's ability to issue the Revised Interim Award and Final Award (or that Prospect was estopped from arguing against the Panel's decisions in these awards) because Prospect had itself requested a modification of the Panel's Interim Award.  (D.I. 35 at 28-29; D.I. 37 at 13-14; D.I. 39 at 14)

[25]    There is no question that if the legal disputes addressed herein were resolved in Respondents' favor, then this Court may properly enforce the awards at issue, pursuant to Section 9 of the FAA.  (D.I. 32 at 1-2)

well.  *Mosquito Hunters, LLC v. Kelwood, Inc.*, Civ. Action No. 21-05033 (FLW), 2021 WL 2850419, at *4 (D.N.J. July 7, 2021).

## IV.   CONCLUSION

For the foregoing reasons, the Court recommends that Prospect's Motion to Vacate and Supplemental Motion be DENIED, and that Respondents' Motion to Enforce be GRANTED.

This Report and Recommendation is filed pursuant to 28 U.S.C. § 636(b)(1)(B), Fed. R. Civ. P. 72(b)(1), and D. Del. LR 72.1.  The parties may serve and file specific written objections within fourteen (14) days after being served with a copy of this Report and Recommendation. Fed. R. Civ. P. 72(b)(2).  The failure of a party to object to legal conclusions may result in the loss of the right to de novo review in the district court.  *See Sincavage v. Barnhart*, 171 F. App'x 924, 925 n.1 (3d Cir. 2006); *Henderson v. Carlson*, 812 F.2d 874, 878-79 (3d Cir. 1987).

The parties are directed to the Court's Standing Order for Objections Filed Under Fed. R. Civ. P. 72, dated March 7, 2022, a copy of which is available on the District Court's website, located at http://www.ded.uscourts.gov.

Dated: May 26, 2023

*Christopher J. Burke*
Christopher J. Burke
UNITED STATES MAGISTRATE JUDGE